**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 15 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DAVID BLAKE OSAGE,

Defendant - Appellant.

No. 99-2235

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. CR-98-552-BB)**

---

Stuart Southerland, Tulsa, Oklahoma, for Appellant.

David N. Williams, Assistant United States Attorney (John J. Kelly, United States Attorney, and J. Miles Hanisee, Assistant United States Attorney, on the brief), Albuquerque, New Mexico, for Appellee.

---

Before **LUCERO** and **ANDERSON** , Circuit Judges, and **MILLS,** [*] District Judge.

---

**ANDERSON** , Circuit Judge.

---

[*]The Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

David Blake Osage appeals his conviction on one count of possession with intent to distribute one kilogram or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A). Mr. Osage moved unsuccessfully to suppress the introduction of the methamphetamine and subsequently pled guilty to the indictment, reserving his right to appeal the suppression ruling. On appeal, he challenges the district court's finding that he consented to the search that resulted in seizure of the methamphetamine. Because we conclude that the search exceeded the scope of the consent given, we reverse and remand this case.

## BACKGROUND

On June 4, 1998, Task Force Officer Sam Candelaria of the New Mexico State Police notified Task Force Officer Jonathan Salazar that Mr. Osage would be traveling through Albuquerque on an Amtrak train that ran between Los Angeles and Chicago. Mr. Osage had paid cash for passage in a sleeping car aboard the train shortly before it left California.

Officer Salazar boarded the train in Albuquerque with another officer, both of whom were in plain clothes. Officer Salazar confronted Mr. Osage in a passageway in the sleeping car, identified himself as a police officer, and asked to speak to him. The officer asked Mr. Osage about his destination and requested to see his tickets. Mr. Osage told Officer Salazar that his tickets were in a bag in his

room.  The officer followed Mr. Osage to his room, where Mr. Osage produced the tickets.

Officer Salazar then asked Mr. Osage about his luggage, and Mr. Osage identified two suitcases.  One of the suitcases, a black bag, was closed and locked.  The officer asked for permission to search the bags.  Mr. Osage responded, "yeah, I guess."  Appellant's App. at 311.  Officer Salazar asked again whether it would be okay to search the bags.  Mr. Osage did not respond verbally, but nodded, gestured upward with his palms, and pointed toward the black bag.

Mr. Osage produced a key and opened the black bag.  Inside, Officer Salazar found plastic grocery bags containing four 28-ounce cans labeled "tamales in gravy."  The officer picked up one of the cans and noticed that the label appeared to have been tampered with, perhaps re-glued.  When he shook the can, he noticed that it did not feel and sound like it contained tamales in liquid, but instead felt like a container of salt would feel when shaken.  He then took a Leatherman tool off his belt, opened the can, and discovered a plastic bag containing methamphetamine.

The district court denied Mr. Osage's motion to suppress on the ground that his consent to search was freely and voluntarily given, and Mr. Osage never limited its scope to exclude opening the tamales can.  Specifically, the court stated, "[w]hile the Court was extremely skeptical that the extent of the consent

extended to physically opening the tamale cans, [Mr. Osage] stood by and watched without demur while the agent took out a can opener and split the can lid. If [Mr. Osage] had questioned this procedure, the outcome of this motion may well have been different." Order at 2, Appellant's App. at 91 (citing United States v. Kim, 27 F.3d 947 (3d Cir. 1994); United States v. Torres, 663 F.2d 1019 (10th Cir. 1981), cert. denied, 456 U.S. 973 (1982); United States v. Pena, 920 F.2d 1509, 1515 (10th Cir. 1990)).

## DISCUSSION

When we review the denial of a motion to suppress, we must accept the district court's factual findings unless they are clearly erroneous. United States v. Wald, 216 F.3d 1222, 1225 (10th Cir. 2000). "The district court's determination of reasonableness under the Fourth Amendment, however, is reviewed de novo." Id.

### I. Validity of Consent

Mr. Osage argues that consent solicited by a police officer is involuntary per se and he argues that the particular consent given in this case was not freely and voluntarily given. He makes a number of subsidiary arguments. Because we conclude that the district court erred in denying his motion to suppress based

upon the scope of the consent, we need not address these other arguments. We assume that Mr. Osage's consent was validly given.

## II. Scope of Consent

Mr. Osage argues that Officer Salazar's actions in opening the tamale can exceeded the scope of the search. When law enforcement officers rely upon consent as the basis for a warrantless search, the scope of the consent determines the permissible scope of the search. See Florida v. Jimeno, 500 U.S. 248, 251-52 (1991). The scope of consent is measured by objective reasonableness: "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Id. at 251.

"We view the evidence in the light most favorable to the government and must uphold a district court's finding that a search is within the boundaries of the consent unless it is clearly erroneous." United States v. Pena, 143 F.3d 1363, 1368 (10th Cir. 1998). While we have stated that a defendant's "failure to object to the . . . search of [a particular area] 'may be considered an indication that the search was within the scope of the consent,'" id. (quoting United States v. Espinosa, 782 F.2d 888, 892 (10th Cir. 1986)), this case presents a more narrow issue: whether Mr. Osage's failure to object to a search of a sealed can permitted

-5-

the officer, in the course of conducting his search, to destroy the can or render it completely useless for its intended function. [1] We conclude that it does not.

The Supreme Court in Jimeno held that "it was objectively reasonable for the police to conclude that the general consent to search [defendant's] car included consent to search containers within that car which might bear drugs." Jimeno, 500 U.S. at 251. The Court accordingly upheld the opening and search of a brown paper bag inside the car. However, the Court also stated, "[i]t is very likely unreasonable to think that a suspect, by consenting to the search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk." Id. at 251-52.

We have not directly addressed the issue of whether a police search which destroys or renders completely useless the item searched exceeds the scope of any consent given for the search. However, we have hinted that a search could be "so invasive or destructive" as to go beyond the scope of the search consented to. See United States v. Santurio, 29 F.3d 550, 553 (10th Cir. 1994) (noting that a "search was not so invasive as to exceed the scope of defendant's consent to the search"

---

[1]The government has never argued that Officer Salazar had articulable suspicion to briefly detain the cans for further investigation or probable cause to seek a warrant. Officer Salazar has never claimed he did. At oral argument of this appeal, the government specifically disavowed any reliance upon that ground. Thus, this case involves only the validity and scope of Mr. Osage's consent to the search of the cans.

where the officer "did not 'tear up' the van or enter the compartment" until a dog alerted on the compartment). Other courts have reached the same conclusion. See, e.g., United States v. Torres, 32 F.3d 225, 231-32 (7th Cir. 1994) ("We agree that 'general permission to search does not include permission to inflict intentional damage to the places or things to be searched.'") (quoting United States v. Martinez, 949 F.2d 1117, 1119 (11th Cir. 1992)); United States v. Strickland, 902 F.2d 937, 941-42 (11th Cir. 1990) (holding that a general consent to search a car does not extend to the "intentional infliction of damage to the vehicle or the property contained within it"); State v. Garcia, 986 P.2d 491, 495 (N.M. Ct. App. 1999) (holding that "[d]efendant's consent to permit the officers to 'look at' her vehicle could not reasonably be interpreted to encompass drilling into the vehicle."), cert. granted, 990 P.2d 824 (N.M. Aug. 11, 1999).

The district court relied upon United States v. Kim, 27 F.3d 947 (3d Cir. 1994), United States v. Torres, 663 F.2d 1019 (10th Cir. 1981) and United States v. Pena, 920 F.2d 1509 (10th Cir. 1990), in support of its conclusion that Mr. Osage's silence while he watched Officer Salazar open the tamales can indicated Mr. Osage's consent to the search of the can. The government places great reliance upon Kim in this appeal. In Kim, officers aboard an Amtrak train received consent to search a handbag accompanying the defendant in his train roomette. One of the officers found inside the bag six cans of "Naturade All-

-7-

Natural Vegetable Protein" which "appeared to be factory-sealed cans with factory lids which were intact." Kim, 27 F.3d at 950. The officer then "opened one of the cans" and discovered methamphetamine inside. Id.

The Third Circuit upheld the search of the can as within the scope of the permission granted. It relied upon Jimeno for its conclusion that "when one gives general permission to search for drugs in a confined area, that permission extends to any items within that area that a reasonable person would believe to contain drugs." Id. at 956. It found no meaningful distinction between the brown paper bag in Jimeno and the sealed cans in the case before it. Moreover, while acknowledging that the Court in Jimeno had stated that a search of a locked suitcase in a vehicle would not be within the scope of a permissive search of the vehicle, the Kim court summarily concluded "cans such as those found in the case sub judice are not similar to locked briefcases." Id. at 957.

We are not persuaded that Kim requires us to reach the same conclusion in this case. First, while the Kim court evidently determined that a sealed can is more like a brown paper bag than a locked briefcase, it provides no explanation for that conclusion. Additionally, the court did not consider whether the can was destroyed or rendered useless after being opened. Indeed, the court may have assumed that it was not so damaged, because it relied upon and quoted the

following reasoning from United States v. Springs, 936 F.2d 1330, 1334-35 (D.C. Cir. 1991) in support of its holding:

> the evidence supports a view that the opening of the baby powder container did not depend upon possession of a key, knowledge of a combination, or anything other than merely removing its lid. Neither did the fact of its opening it render it useless, anymore than the opening of the folds destroyed the usefulness of the paper bag in Jimeno.

(emphasis added). We conclude that the opening of a sealed can, thereby rendering it useless and incapable of performing its designated function, is more like breaking open a locked briefcase than opening the folds of a paper bag.

We acknowledge that the Supreme Court and this court have previously stated that a general consent to search a particular area is reasonably understood to extend to a search of containers within that area that could contain contraband, absent some indication by the suspect that he wishes to terminate or limit the search. See Jimeno, 500 U.S. at 252 ("[I]f [a suspect's] consent would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization."); United States v. Gordon, 173 F.3d 761, 766 (10th Cir.) ("We consistently and repeatedly have held a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent."), cert. denied, 120 S. Ct. 205 (1999). However, we do not read that authority to permit

-9-

the destruction of such containers. [2] We therefore hold that, before an officer may actually destroy or render completely useless a container which would otherwise be within the scope of a permissive search, the officer must obtain explicit authorization, or have some other, lawful, basis upon which to proceed.

For the foregoing reasons, the district court's decision denying suppression of the methamphetamine found in the tamales cans is REVERSED and the case is REMANDED for further proceedings consistent herewith.

---

[2]We do not read our prior cases in Torres and Pena, upon which the district court relied, to compel a different result in this case. In Torres, a defendant gave police permission to search a car. In conducting the search, the officers "pull[ed] out an ashtray in the side of the door," and "removed the air-vent cover in the side of the door," where they found contraband. Torres, 663 F.2d at 1021. We held that search was "within the bounds of the actual consent given." Id. at 1027.

Similarly, in Pena, after receiving permission to search a vehicle, the police officer "got a screwdriver . . . and removed the rear quarter panel vent" of the vehicle, where he discovered contraband. Pena, 920 F.2d at 1512. The defendant at no time objected to the search. We held that the search "was conducted within the general scope of the permission granted." Id. at 1515. Neither Pena nor Torres involved the actual destruction of the item searched, as occurred in this case.

Other cases in our circuit have permitted some "dismantling" of an item searched, but none have permitted complete and utter destruction or incapacitation of an item or container. See, e.g., Pena, 143 F.3d at 1368 (holding that consent to search motel room included "search into the area above the bathroom ceiling" in the face of no objection by defendant); United States v. McRae, 81 F.3d 1528, 1537-38 (10th Cir. 1996) (stating that consent to search car trunk permitted officer to lift crinkled carpet area in the face of no objection by defendant); Santurio, 29 F.3d at 552-53 (holding that consent to search interior of car included removal of screws from strip holding down carpeting).