# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-40418

United States Court of Appeals
Fifth Circuit

**FILED**
June 15, 2017

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

ALEXIS GONZALEZ-BADILLO,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 5:15-CR-399

Before REAVLEY, ELROD, and GRAVES, Circuit Judges.

PER CURIAM:[*]

Appellant Alexis Gonzalez-Badillo appeals the district court's denial of his motion to suppress evidence. He contends that a Laredo police officer exceeded the scope of his consent when the officer, while searching a travel bag, opened the sole of a boot to find illegal drugs. Because Gonzalez-Badillo's consent extended to the boot sole, we AFFIRM the district court's judgment.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 16-40418

## BACKGROUND

Police searched Gonzalez-Badillo's boot sole as part of a criminal interdiction effort at the Americanos Bus Station in Laredo, Texas on April 10, 2015. Gonzalez-Badillo had been in line to board a bus to Houston when he made several "strange" comments about his itinerary to Laredo police officer Rogelio Nevarez. Officer Nevarez subsequently asked and received permission to search Gonzalez-Badillo's travel bag. Before searching the bag, Officer Nevarez took Gonzalez-Badillo's California identification card, apparently keeping it throughout the encounter. He then informed Gonzalez-Badillo that he was looking for anything illegal traveling through the bus station.

The magistrate judge's report and recommendations describe the specifics of the search:

> As soon as Officer Nevarez opened the bag, he smelled a strong chemical odor that he recognized as a masking agent used in drug smuggling. Officer Nevarez further observed a pair of used work boots inside of translucent plastic shopping bags. When Officer Nevarez grasped the bags containing the boots, he could feel that the soles of the boots were lumpy. Officer Nevarez compared it to the feeling of soles full of sand instead of the normal hard soles of work boots. Officer Nevarez further testified that he had felt boots like this before that were being used to smuggle drugs and had seen this method of drug smuggling during trainings. At this point, Officer Nevarez informed Defendant that he was "99% sure" that there were drugs in the boots and put the boots up for Defendant to smell them. Officer Nevarez testified that Defendant then began sweating more and made a surprising face.

> When Officer Nevarez removed the boots from the plastic bags, he observed a small opening on the side of one of the boots where it appeared that the sole wasn't glued all the way shut. Officer Nevarez could see plastic inside the sole of the boot by manipulating the boot to look through the slit in

2

No. 16-40418

> the side of the sole without increasing the size of the opening. At that point, Officer Nevarez used his fingers to pull open the boot from this opening, which revealed a plastic bag containing a brown rocky substance, later confirmed to be heroin. Defendant was then placed under arrest and read his Miranda rights.

Gonzalez-Badillo initially invoked his constitutional right to remain silent. But he later agreed to make inculpatory statements, first to Laredo police, and then to Drug Enforcement Administration ("DEA") agents. While in DEA custody, Gonzalez-Badillo also signed written waivers of his rights and provided a written statement.

Gonzalez-Badillo subsequently moved to suppress all physical evidence seized by police and statements made while in custody. The magistrate judge held a suppression hearing on July 6, 2015. He recommended that the district court deny Gonzalez-Badillo's motion to suppress the physical evidence, but grant it regarding the inculpatory statements. After independently reviewing the facts of the case and relevant case law, the district court adopted the magistrate judge's recommendation on January 15, 2016. Gonzalez-Badillo timely appeals from the district court's judgment.

## STANDARD OF REVIEW

"When we review a district court's denial of a motion to suppress, we view the facts in the light most favorable to the prevailing party, accepting the district court's factual findings unless clearly erroneous and considering all questions of law de novo." *United States v. Menchaca-Castruita*, 587 F.3d 283, 289 (5th Cir. 2009).

No. 16-40418

**DISCUSSION**

Gonzalez-Badillo claims that the district court erred when it denied his motion to suppress evidence found in the boot sole. First, he argues that his consent to search the travel bag did not extend to a search of the boot sole. Second, he asserts that no other exceptions to the Fourth Amendment's warrant requirement apply here. Because we find that Gonzalez-Badillo consented to the search, we need not address his other arguments.

"A search conducted pursuant to consent is one of the well-settled exceptions to the Fourth Amendment's warrant requirement." *United States v. Tomkins,* 130 F.3d 117, 121 (5th Cir. 1997). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

As stated above, Gonzalez-Badillo does not contest that he consented to the search of his travel bag. Instead, he argues that Officer Nevarez's search of the boot sole exceeded the scope of his initial consent. To determine the scope of consent, the following factors inform our analysis: First, "a reasonable person would have understood [his] consent for the search of his luggage to include permission to search any items inside his luggage which might reasonably contain drugs." *United States v. Maldonado*, 38 F.3d 936, 940 (7th Cir. 1994). For example, in *Maldonado,* the Seventh Circuit concluded that the scope of the defendant's consent extended to a closed juicer box that was taped shut, even though "Maldonado testified that he told Agent Boertlein that he did not want to open the juicer boxes because the items inside were gift

4

wrapped."[1] *Id.* at 938. The court reasoned that Maldonado should have expected drug enforcement officers would open the boxes because they told him that "they were looking for individuals traveling with large quantities of illegal drugs." *Id.* at 940. Furthermore, "[t]he juicer boxes found in Maldonado's luggage had been repackaged and closed with tape, and such boxes may be thought by a reasonable person to contain drugs." *Id.*

Similarly, Officer Nevarez explicitly informed Gonzalez-Badillo that he was looking for anything illegal traveling through the bus station and asked for consent to search the bag. *See Jimeno*, 500 U.S. at 251 ("The scope of a search is generally defined by its expressed object."). In addition, Officer Nevarez reasonably concluded that the boots were inherently suspicious: (1) Gonzalez-Badillo's bag and boots smelled of drug-masking agent; (2) the boots were unlike normal boots: the soles were "lumpy" as if they were "full of sand instead of the normal hard soles of work boots;" (3) the boot soles were already damaged and had "plastic" clearly visible inside; and (4) similar boots had been used as vehicles for drug smuggling. Furthermore, given that Officer Nevarez

---

[1]The dissent argues that we "attempt[] to downplay the significance of the officer's testimony in *Maldonado* that the suspect consented to the search of his bag" even though "the Seventh Circuit's decision expressly relied on" the testimony. However, counter the dissent's argument, the officer's testimony in *Maldonado* did not play a critical role in the Seventh Circuit's analysis. While it noted that "the district court never discredited [the officer's] testimony," it based its holding on "all the surrounding circumstances" including the district court's finding that "Maldonado did not withdraw his consent, nor did he limit the scope of his consent in the sense of refusing to allow Agent Boertlein to look inside the juicer boxes." *See Maldonado*, 38 F.3d at 940-41. Furthermore, the Seventh Circuit stated that "[d]etermining the parameters of a consensual search is an issue of fact that must be distilled from the totality of the circumstances surrounding the search; moreover, the resolution of such factual questions is entrusted to the district court and will not be lightly overturned on appeal." *Id.* at 941. The district court acknowledged that Maldonado disputed the officer's testimony and "made no explicit determination as to which testimony it found more credible[.]" *Id.* at 938.

No. 16-40418

explicitly informed Gonzalez-Badillo that he believed the boots contained drugs and "put the boots up for [him] to smell" before opening the sole, Gonzalez-Badillo "should have expected that [Officer Nevarez] would examine the[ir] contents." *See Maldonado*, 38 F.3d at 940 (quoting *United States v. Berke*, 930 F.2d 1219, 1223 (7th Cir. 1991)).

Second, "courts can look at the defendant's conduct to help determine the scope of a consensual search." *Id.* For example, "[a] failure to object to the breadth of the search is properly considered an indication that the search was within the scope of the initial consent." *United States v. Mendoza-Gonzalez*, 318 F.3d 663, 670 (5th Cir. 2003). Here, we find that Gonzalez-Badillo's conduct during the search suggests that the scope of his consent extended to the boot sole. Importantly, Gonzalez-Badillo did not revoke or limit his consent to search his bag, even when Officer Nevarez indicated that he believed the boots contained drugs and offered them to Gonzalez-Badillo to smell. Instead, "Defendant . . . began sweating more and made a surprising face." Gonzalez-Badillo also did not limit the search as Officer Nevarez continued to examine the boots, eventually using his fingers to pull open the sole from the already present hole.[2] *Id.*

Gonzalez-Badillo correctly points out that, although a general consent to search encompasses unlocked containers, locked containers require special

---

[2] The dissent argues that "Gonzalez-Badillo's failure to object when Officer Nevarez began prying the sole from the boot is of little probative value" because "[a]ll parties agree that the search was within the scope of consent up until the point of separating the sole from the boot" and "[t]here is no indication that Gonzalez-Badillo had any meaningful opportunity to object between the time Officer Nevarez was looking through the slip and when he separated the sole from the boot." We disagree. When Officer Nevarez informed Gonzalez-Badillo that he believed the boots contained drugs, Gonzalez-Badillo was clearly on notice that Officer Nevarez intended to search them. *See Maldonado*, 38 F.3d at 940. Consequently, Gonzalez-Badillo had the opportunity to limit his consent at any point between the time when Officer Nevarez made his suspicions known and when he actually opened the sole.

consent or a warrant. *See Jimeno*, 500 U.S. at 251-52 ("It is very likely unreasonable to think that a suspect, by consenting to the search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk . . . ."). He also claims that this case is very similar to *United States v. Osage*, 235 F.3d 518, 520 (10th Cir. 2000), where the Tenth Circuit found that searching inside a sealed can of tamales exceeded the scope of the defendant's consent to search his luggage. In that case, the court "conclude[d] that the opening of a sealed can, thereby rendering it useless and incapable of performing its designated function, is more like breaking open a locked briefcase than opening the folds of a paper bag." *Id.* at 521. It also stated: "[B]efore an officer may actually destroy or render completely useless a container which would otherwise be within the scope of a permissive search, the officer must obtain explicit authorization, or have some other, lawful, basis upon which to proceed." *Id.* at 522. Analogizing to *Osage*, Gonzalez-Badillo suggests that Officer Nevarez's search of the boot sole was "more like breaking open a locked briefcase" because he had to pull open the sole to recover the drugs inside. *Id.* at 521.

However, Gonzalez-Badillo's argument is not persuasive. First, *Osage* is not binding authority, and furthermore, the facts there are distinguishable from those here. Unlike in *Osage*, the record does not show that Officer Nevarez "destroy[ed]" the already-damaged boots or rendered them any less useful than they had been before the sole was pulled open from a pre-existing hole. *Id.* at 520. Moreover, we are not persuaded that Gonzalez-Badillo's boot should be considered akin to a locked container simply because Officer Nevarez opened up the boot sole to recover drugs. Here, Officer Nevarez's actions inflicted minimal damage on the boot, the sole of which had previously been pried open and glued down to insert drugs. *Compare United States v. Marquez*, 337 F.3d 1203, 1209 (10th Cir. 2003) (stating that [i]f damage to the

compartment did occur" as the result of officers' prying open a nailed-down plywood covering, "it was de minimis in nature"), *with United States v. Ibarra*, 965 F.2d 1354, (5th Cir. 1992) (en banc) (7-7 decision) ("We would hold that a typical reasonable person would not have interpreted Chambers' consent to extend to breaking the boards securing the attic entrance."), *and United States v. Strickland*, 902 F.3d 937, 942 (11th Cir. 1990) ("[I]t is difficult to conceive of any circumstance in which an individual would voluntarily consent to have the spare tire of their automobile slashed."). Given that Gonzalez-Badillo's boot was not akin to a locked container, the district court did not err. *See Jimeno*, 500 U.S. at 251-52.

## CONCLUSION

For the reasons stated above, we AFFIRM the judgment of the district court.

No. 16-40418

JENNIFER WALKER ELROD, Circuit Judge, dissenting:

The Fourth Amendment enshrines our Constitution's commitment to "protect liberty and privacy from arbitrary and oppressive interference by government officials." *United States v. Ortiz*, 422 U.S. 891, 895 (1975). Our Founders knew that "[u]ncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government," and "[a]mong deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart" as unreasonable government intrusion into individual privacy. *Brinegar v. United States*, 338 U.S. 160, 180 (1949) (Jackson, J., dissenting).[1]

Here, an individual's privacy right presents itself as the sole of a work boot. The majority opinion holds that general consent to search a bag encompasses consent to pry the sole off of a boot found within the bag. This holding does not comport with the Fourth Amendment, and none of the Government's other arguments render the search lawful. Because I cannot approve of this erosion of Fourth Amendment protections, I respectfully dissent.

---

[1] Writing of James Otis's famous 1761 argument to the Massachusetts Superior Court against writs of assistance, John Adams concluded: "Then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born." *See* Thomas K. Clancy, *The Framer's Intent: John Adams, His Era, and the Fourth Amendment*, 86 IND. L.J. 979, 1005 (2011). Drawing on Otis's arguments, Adams drafted Article 14 of the Massachusetts Declaration of Rights—later a model for the Fourth Amendment—which declared that "[e]very subject has a right to be secure from all unreasonable searches and seizures of his person, his house, his papers, and all his possessions." *See* Clancy, *The Framer's Intent*, at 1027–28; *see also* 3 Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1895, at 748 (1833) ("[The Fourth Amendment] seems indispensable to the full enjoyment of the rights of personal security, personal liberty, and private property.").

No. 16-40418

## I.

This appeal raises two core questions: First, did Gonzalez-Badillo's consent to have his bag searched include consent to pry open the sole of his boot? Second, if it did not, does any exception to the warrant requirement render the search lawful? I would hold that the Fourth Amendment answers "no" to both questions.

## A.

The majority opinion proceeds as if this is a run-of-the-mill appeal in which an individual, having clearly consented to a search, now regrets the decision and seeks to ignore that consent. It is not. While the majority opinion concludes that Gonzalez-Badillo consented to the search of his boot, neither the district court judge nor the magistrate judge found the issue so easy; in fact, both judges went out of their way to *avoid* deciding this issue and instead rested their suppression decisions on other grounds. And for good reason. The majority opinion's holding that general consent to search a bag includes authorization to damage property found within it is deeply flawed and has not been accepted by any decision on which the majority opinion or the Government relies.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend IV. As a general matter, a warrant is necessary for an involuntary search to be reasonable under the Fourth Amendment, but it is also well-established that a search is reasonable if a citizen voluntarily consents to the search. *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995); *Florida v. Jimeno*, 500 U.S. 248, 250–51 (1991). Where consent has been given, disputes regarding the constitutionality of a search often focus on the scope of the consent.

No. 16-40418

To discern this scope, we apply a standard of "objective reasonableness": "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251. Thus, even where there has been general consent to search, the extent of an officer's search within an area (*e.g.*, a car or a bag) "is not limitless" and always depends on the objective reasonableness of searching the particular item involved. *United States v. Ibarra*, 965 F.2d 1354, 1358 (5th Cir. 1992) (en banc) (7–7 decision); *see also Jimeno*, 500 U.S. at 251–52 (holding that consent to search a car included consent to open and search a paper bag hidden beneath a seat but noting that "[i]t is very likely unreasonable to think that a suspect, by consenting to the search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk"). Accordingly, courts have held that while consent to search a space includes consent to search unlocked containers within that space, the consent does *not* extend to damaging property found within. *Compare United States v. Strickland*, 902 F.2d 937, 942 (11th Cir. 1990) (holding that consent to search a vehicle did not include consent to slash a spare tire and look inside), *with United States v. Jackson*, 381 F.3d 984, 988–89 (10th Cir. 2004) (holding that consent to search a bag included consent to search a baby powder container where no damage was inflicted to the container).

Under this standard, Gonzalez-Badillo's consent to let Officer Nevarez search his bag did not authorize Officer Nevarez to separate the sole from his boot. Officer Nevarez did not find drugs in an unsealed container, a bag, or any other item that opens and closes as part of its normal function; he found the drugs in the sole of Gonzalez-Badillo's boot, which—but for a quarter-sized slit—was sealed shut. In order to retrieve the plastic bag from the boot, Officer Nevarez inflicted damage by forcibly tearing the sole from the boot. I simply

11

cannot agree with the majority opinion that a "typical reasonable person" would understand or intend consent to a search of a bag to include consent to forcibly dismantle footwear. *See Jimeno*, 500 U.S. at 251. And it makes no difference that this case involves work boots that can be glued back together, rather than high-end Christian Louboutin pumps: Fourth Amendment protections do not wax and wane based on the monetary value of a citizen's property.

Other circuits' decisions support this conclusion. For example, in *Strickland*, the Eleventh Circuit addressed whether a suspect's consent to search his car included consent to slash the spare tire and look inside. 902 F.2d at 939, 941–42. Though concluding that one who consents to a search can "expect that search to be thorough," the Eleventh Circuit drew the line at the destruction of property: "[U]nder the circumstances of this case, a police officer could not reasonably interpret a general statement of consent to search an individual's vehicle to include the intentional infliction of damage to the vehicle or the property contained within it." *Id.* at 941–42; *see also id.* at 942 ("[I]t is difficult to conceive of any circumstance in which an individual would voluntarily consent to have the spare tire of their automobile slashed.").

The Tenth Circuit in *United States v. Osage*, 235 F.3d 518 (10th Cir. 2000), likewise concluded that general consent to search does not authorize damage to property. There, a suspect consented to an officer's request to search his bag. *Id.* at 519. Upon finding what appeared to be a sealed can of tamales inside, the officer proceeded to open the can and found methamphetamine. *Id.* The Tenth Circuit held that "destroying" or rendering property "completely useless" is not included within general consent to search and so the officer's search of the tamale can was not authorized. *Id.* at 521–22; *see also Cross v. State*, 560 So. 2d 228, 230 (Fla. 1990) (holding that consent to search tote bag

"did not extend to cutting into or breaking open sealed containers located therein").

By contrast, where the contents of a container can be accessed without damaging the container itself, courts have held that general consent to search includes authorization to search the container. For example, in *Jackson*, a suspect consented to the search of his bag, which held a container of baby powder. 381 F.3d at 987. The officer removed the top of the container without damaging it and, after finding a clear plastic bag concealed within, replaced the lid. *Id.* The Tenth Circuit concluded that the suspect's consent to search his bag extended to the search of the container, noting in particular that the search "did not destroy or render the container useless," *id.* at 988, that the officer "easily removed the lid" without inflicting any damage, *id.* at 987, and that "the lid [could be] placed back onto the container, [which] . . . worked properly," *id.* at 988–89; *see also United States v. Stewart*, 93 F.3d 189, 191–92 (5th Cir. 1996) (holding that consent to search a bag and look at a medicine bottle authorized an officer to open the medicine bottle).

As in *Strickland* and *Osage* and unlike in *Jackson*, Officer Nevarez's search physically damaged the property being searched. The fact that Gonzalez-Badillo consented to a search of his bag no more authorized Officer Nevarez to damage his boot than the consents to search in *Strickland* and *Osage* authorized the officers in those cases to damage the suspects' property. *Cf. Strickland*, 902 F.2d at 939, 941–42; *Osage*, 235 F.3d at 519, 521–22. In these cases, consent to search did not include consent to damage. For the same reason, this case is distinct from *Jackson*. The sole of Gonzalez-Badillo's boot was not removed without inflicting damage—everyone concedes that Officer Nevarez tore the sole from the boot to some degree; nor could the boot be repaired simply by placing the sole back on the boot like a lid on a container.

*Cf. Jackson*, 381 F.3d at 988 (lid to the baby powder container was "placed back onto the container" so it "worked properly").

None of the majority opinion's contrary arguments is persuasive. The majority opinion first relies on the Seventh Circuit's decision in *United States v. Maldonado*, 38 F.3d 936 (7th Cir. 1994). In that case, the Seventh Circuit held that the suspect's consent to search his bag included consent to search boxes within the bag, relying in part on its conclusion that "a reasonable person would have understood [the suspect's] consent for the search of his luggage to include permission to search any item inside his luggage which might reasonably contain drugs." *Id.* at 940. To begin with, this decision did not rely on that reason exclusively, instead grounding its holding in "all the surrounding circumstances," including the suspect's conduct and the officer's testimony that the suspect *actually consented* to opening the boxes.[2] *Id.* More importantly, neither *Maldonado* nor any other decision relied on by the majority opinion holds that consent to search a bag (or a similar item) would be understood by "the typical reasonable person" to include consent to

---

[2] The majority opinion attempts to downplay the significance of the officer's testimony in *Maldonado* that the suspect consented to the search of his bag because the district court did not make an "explicit determination as to which testimony it found more credible." *See Maldonado*, 38 F.3d at 938. Whatever may be true of the district court's decision in that case, the Seventh Circuit's decision expressly relied on the fact that "the district court never discredited . . . testimony" that the defendant "nodded his head in response to [a] request for further consent to search the juicer boxes." *Id.* at 940.

dismantle or damage an article of clothing in order to look inside it.[3] *Cf. Jimeno*, 500 U.S. at 251.[4]

The majority opinion next relies on Gonzalez-Badillo's failure to object to Officer Nevarez's search when he first began to pry the sole from the boot. It is true that a suspect's failure to object to the breadth of the search is "an indication that the search was within the scope of the initial consent." *Mendoza-Gonzalez*, 318 F.3d at 670. Here, however, Gonzalez-Badillo's failure to object when Officer Nevarez began prying the sole from the boot is of little probative value. All parties agree that the search was within the scope of consent up until the point of separating the sole from the boot, including Officer Nevarez's manipulation of the quarter-sized slit in an effort to look inside the sole. There is no indication that Gonzalez-Badillo had any meaningful opportunity to object between the time Officer Nevarez was looking through the slit and when he separated the sole from the boot. As the magistrate judge found, Officer Nevarez never asked Gonzalez-Badillo if he could remove the sole.

---

[3] The majority opinion relies further on its position that "Officer Nevarez reasonably concluded that the boots were inherently suspicious." This is a *non sequitur*. The fact that Officer Nevarez reasonably concluded that the boot was suspicious—a point no one disputes—does not at all suggest that "the typical reasonable person" would believe that consenting to the search of a bag would include consenting to have a boot torn open. The fact that the "boots were inherently suspicious" shows only that Officer Nevarez likely could have successfully obtained a warrant.

[4] *See also United States v. Mendoza-Gonzalez*, 318 F.3d 663, 666–72 (5th Cir. 2003) (holding that consent to search within trailer included consent to search within cardboard boxes within the trailer where no damage was inflicted on the boxes); *United States v. Flores*, 63 F.3d 1342, 1362 (5th Cir. 1995) (holding under plain error standard of review that consent to search a vehicle authorized "merely unscrew[ing] two screws and remov[ing] two vent covers" that could be replaced without damage); *United States v. Marquez*, 337 F.3d 1203, 1209 (10th Cir. 2003) (holding that consent to search RV for drugs and guns included consent to search under bench seat where the district court found removal of plywood did not cause any damage).

15

No. 16-40418

The majority opinion responds that Gonzalez-Badillo was "on notice" that Officer Nevarez was going to dismantle the boot when he expressed his belief that the boot contained drugs and invited Gonzalez-Badillo to smell it. Even if this were true, the fact that Gonzalez-Badillo may have *then* realized that Officer Nevarez might dismantle his boot says nothing at all as to whether his initial general consent authorized the damage to his property. Because a "typical reasonable person" would not anticipate that her general consent to a search authorizes damage to her property, any alleged "notice" to Gonzalez-Badillo just before Officer Nevarez dismantled the boot offers little insight as to the scope of Gonzalez-Badillo's general consent.[5]

Distinguishing the Tenth Circuit's decision in *Osage*, the majority opinion argues that Gonzalez-Badillo's consent authorized the dismantling of his boot because Officer Nevarez's search did not "destroy" the boot or "render[] [it] any less useful than [it] had been before the sole was pulled open from a pre-existing hole." To begin with, the majority opinion cites no case of ours holding that destroying or rendering property useless is necessary—not merely sufficient—to finding a search outside the bounds of general consent. Indeed, most of the cases on which the majority opinion relies were careful to emphasize that *no damage* resulted from the searches at issue. *See supra* at n.4. In any event, Gonzalez-Badillo's boot *was* rendered useless as footwear

---

[5] I agree that a suspect's failure to limit the scope of a search can be probative of whether that suspect's initial, general consent authorized the search. However, the factual circumstances "are highly relevant when determining what the reasonable person would have believed to be the outer bounds of the consent that was given." *Mendoza-Gonzalez*, 318 F.3d at 667. Thus, there are undoubtedly situations where the scope of an officer's search exceeds the bounds of what a "typical reasonable person" might expect her general consent to authorize, such that the suspect's failure to affirmatively limit that consent after the fact is not informative. For example, the fact that a suspect authorizes an officer to search her person would not be thought to authorize a body-cavity search, regardless of whether the suspect subsequently attempted to limit the scope of the search.

16

after Officer Nevarez pried off its sole. A boot with a detached, or partially detached, sole does not give the wearer a stable foundation on which to walk, nor is it effective to protect against dirt, water, and other elements.[6]

Relying on *United States v. Marquez*, the majority opinion argues further that the search was lawful because Officer Nevarez "inflicted minimal damage on the boot." To begin with, unlike in this case, the district court in *Marquez* expressly "found" that the suspect's property was not "damaged or destroyed" as a result of the search. 337 F.3d at 1209. Even assuming *arguendo* that damage was minimal, that should not change the outcome of this case. In *Osage*, for example, the can of tamales—like Gonzalez-Badillo's boot—had already been opened by the suspect in order to insert drugs and then resealed. *See Osage*, 235 F.3d at 519, 520–21. Nonetheless, the Tenth Circuit concluded that the suspect's general consent to search did not authorize the officer to reopen the tamale can—even though the suspect could have easily resealed the tamale can just as he had done after inserting the drugs. Thus, contrary to the majority opinion's approach, the Tenth Circuit held a search unconstitutional despite the "minimal" damage to the suspect's property.[7]

In any event, adopting a blanket rule requiring destruction or uselessness is inconsistent with Supreme Court precedent and gets the Fourth Amendment inquiry exactly backwards. The Fourth Amendment requires us to determine the scope of consent from the standpoint of "the typical reasonable

---

[6] Indeed, although some footwear derives a significant amount of its value from the soles (the aforementioned Christian Louboutins), all shoes need soles to be useful as shoes. These work boots' lack of a signature red sole or high-dollar pricetag does not mean that they are just as useful with as without soles.

[7] Under the majority opinion's theory, a search of a locked briefcase would be constitutional if the briefcase could be subsequently rendered functional—and yet the Supreme Court has cautioned that "[i]t is very likely *unreasonable* to think that a suspect, by consenting to the search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk." *See Jimeno*, 550 U.S. at 251–52 (emphasis added).

person," *Jimeno*, 500 U.S. at 251, not by imposing a one-size-fits-all rule. As to this inquiry, the factual circumstances "are highly relevant when determining what the reasonable person would have believed to be the outer bounds of the consent that was given." *Mendoza-Gonzalez*, 318 F.3d at 667 (citing *Ibarra*, 965 F.2d at 1357). So, even if destruction and uselessness were the appropriate rule to apply to a box or other container, a broader rule should apply to an article of clothing (such as a boot), which is different in kind: its intended use is not storage, nor is it designed to be opened and closed like a container.

Accordingly, I would hold that Gonzalez-Badillo's consent to a search of his bag would not be understood by the "typical reasonable person" to authorize Officer Nevarez to remove the sole of his boot. *See Jimeno*, 500 U.S. at 251.

### B.

The majority opinion decides this appeal exclusively on the scope-of-consent issue. Because I do not agree that Gonzalez-Badillo's general consent authorized Officer Nevarez to disassemble the boot, I address the Government's other arguments for affirmance. The Government argues that the suppression ruling can be affirmed on the bases relied on by the magistrate judge and the district court judge: (1) the search was reasonable because it was authorized by the "plain view" exception to the warrant requirement; and (2) the search was reasonable because of exigent circumstances. We review whether the plain view doctrine applies *de novo*, and we review a determination of exigent circumstances for clear error. *See United States v. Williams*, 41 F.3d 192, 196 (4th Cir. 1994); *see also United States v. Blount*, 123 F.3d 831, 837 (5th Cir. 1997).

### 1.

Under the "plain view" doctrine, "[l]aw enforcement officers may seize anything they find in plain view without a search warrant." *United States v.*

*Munoz*, 150 F.3d 401, 411 (5th Cir. 1998). This exception applies where: (1) the officers "are lawfully in a position" to view the object; (2) "its incriminating character is immediately apparent"; and (3) "the officers have a lawful right of access to it." *Id.*; *see also United States v. De Jesus-Batres*, 410 F.3d 154, 159 (5th Cir. 2005).

The "plain view" exception to the Fourth Amendment plainly does not render the search of Gonzalez-Badillo's boot constitutional. As just explained, Gonzalez-Badillo's general consent to search his bag did not authorize Officer Nevarez to pry open the sole of his boot, and so Officer Nevarez did not have a "lawful right of access" to the contents of the boot. *Munoz*, 150 F.3d at 411.

The Government contends, however, that the search was justified by the plain view exception because, in its view, it was a "foregone conclusion" that there was contraband in the sole of the boot because of all the other evidence pointing this direction. This argument confuses the Fourth Amendment analysis: probable cause does not, in normal circumstances, authorize a search; it is instead the key to obtaining a warrant which, in turn, authorizes the search. *Vernonia Sch. Dist. 47J*, 515 U.S. at 653 ("Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, this Court has said that reasonableness generally requires the obtaining of a judicial warrant," and "[w]arrants cannot be issued, of course, without the showing of probable cause."). Contrary to the Government's position, the existence of overwhelming probable cause is not a reason to ignore the warrant requirement; indeed, it is in precisely those circumstances that a warrant will be the easiest to obtain. The Government cites no binding authority to support its argument.[8]

---

[8] The Government's reliance on *United States v. Corral*, 970 F.2d 719 (10th Cir. 1992) is unpersuasive. In that case, the Tenth Circuit held that the plain view doctrine authorized

**2.**

Nor is the warrantless search justified by an exigent circumstance. It is well-established that a warrantless search may be lawful where circumstances requiring immediate action are present. *See United States v. Rico*, 51 F.3d 495, 500–01 (5th Cir. 1995). For example, we have recognized that a warrantless search may be lawful where: (1) there is "the possibility that evidence will be removed or destroyed"; (2) officers are in "pursuit of a suspect"; or (3) there is an "immediate safety risk[ ] to officers and others." *United States v. Newman*, 472 F.3d 233, 237 (5th Cir. 2006).

The Government, following the magistrate judge's reasoning, argues that exigent circumstances existed in this case because Gonzalez-Badillo was preparing to board a bus. This is simply wrong. Gonzalez-Badillo was no longer in line to board the bus; he had voluntarily stepped out of line at Officer Nevarez's request while the search was being conducted. Nor was any other exigent circumstance present. There is absolutely no evidence or contention that Gonzalez-Badillo posed a threat to Officer Nevarez or anyone else. It is conceded that he did not possess a weapon, and there is no suggestion that Officer Nevarez suspected him of possessing a weapon. Far from signaling potential danger, Gonzalez-Badillo cooperated fully with Officer Nevarez's every request. Further, there was no potential for destruction of evidence as Officer Nevarez was in possession of the bag and the boot.

---

the warrantless search of a brick of cocaine (*i.e.*, to cut the wrapping around the cocaine) because of the "virtual certainty" that the packaging contained cocaine, and so no further expectation of privacy was invaded by physically searching the brick. *Id.* at 725–26. There, however, the "certainty" followed from the fact that an undercover police officer had previously cut into the packaging and confirmed that it contained cocaine and then subsequently communicated this fact to his colleagues who conducted the search. *Id.* at 722–23, 725–26. Whatever the merits of this decision—which is not binding—the basis for virtual certainty in that case does not exist here.

The Government relies on our decision in *United States v. Johnson*, 862 F.2d 1135 (5th Cir. 1988), but that decision is readily distinguishable. There, the warrantless search was conducted when the police officers had been informed that the two suspects "could be armed," where the officers would have "needed to use both surprise and superior force in effecting the arrest," where there were "many innocent citizens . . . waiting in the bus station," and where the "suspects were preparing to leave within minutes." *Id*. at 1138–40; *see also id*. at 1141. It was based on these factors—"and in particular the reasonable concerns for safety presented by this arrest"—that the warrantless search was upheld in *Johnson. Id*. at 1139. None of these factors is present here.

The Government's argument is especially unconvincing given that Gonzalez-Badillo has conceded that Officer Nevarez had probable cause (or at least reasonable suspicion) to detain him while awaiting a warrant authorizing a search of the boot. To find exigency in these circumstances would invite law enforcement to forego taking steps lawfully available to them.

\* \* \* \* \*

I would therefore hold that the magistrate judge and the district court judge wrongly applied the plain view doctrine and clearly erred in finding exigent circumstances.

## II.

To ensure that our constitutional liberties endure, the judiciary must resist any invitation to ease the Fourth Amendment's reins on government action—especially in cases like this one, as the parameters of Fourth Amendment protection are constantly litigated in drug cases. *See, e.g.*, Nancy Leong, *Making Rights*, 92 B.U. L. REV. 405, 435 (2012). Unfortunately, the majority opinion has let down its guard. According to the majority opinion, law enforcement is now free to construe general consent to search a bag to include

consent to pull apart, pry open, or otherwise dismantle property found within—all on the implausible premise that a reasonable person would contemplate such damage to property when giving general consent to search a bag. This ruling "does not implement the high office of the Fourth Amendment to protect privacy." *Georgia v. Randolph*, 547 U.S. 103, 127 (2006) (Roberts, C.J., and Scalia, J., dissenting).

Because Gonzalez-Badillo did not consent to the warrantless search of his boot and because the Government offers no other valid basis for justifying the search, I would reverse the denial of the motion to suppress and vacate his conviction and sentence. I respectfully dissent.